UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In Re:                                              Case No. 6:15-bk-02498-KSJ
                                                    Chapter 7
WADE MARTIN ROME and
KATHLEEN MALONEY ROME,

                    Debtors.
_____/

CARLA P. MUSSELMAN, CHAPTER 7                       Adv. Proc. No.
TRUSTEE FOR THE ESTATE OF
WADE MARTIN ROME AND
KATHLEEN MALONEY ROME,

                    Plaintiff,

vs

WADE MARTIN ROME and
KATHLEEN MALONEY ROME

                    Defendants.
_____/

## ADVERSARY COMPLAINT

CARLA P. MUSSELMAN, Trustee of the Chapter 7 Estate of Wade Martin Rome and

Kathleen Maloney Rome ("Trustee"), sues Defendants, Wade Martin Rome (the "Debtor Husband")

and Kathleen Maloney Rome (the "Debtor Wife"), together referred to herein as the "Debtors," and

alleges:

### PARTIES, JURISDICTION, AND VENUE

1.    On March 23, 2015 (the "Petition Date"), the Debtors filed a voluntary petition for

relief under Chapter 7 of the Bankruptcy Code (the "Bankruptcy Case").

2.    The Bankruptcy Case was assigned Case No.:  6:15-bk-02498-KSJ.

3.    The Bankruptcy Case is pending in the United States Bankruptcy Court for the

Middle District of Florida, Orlando Division.

4.       The Court appointed CARLA P. MUSSELMAN as the Trustee of the Debtors' Chapter 7 bankruptcy estate.

5.       The Debtors are individuals, have been husband and wife at all time relevant hereto, and are residents of the State of Florida.

6.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157(b)(2)(I), (J) and 28 U.S.C. § 1334, and related law.

7.       Venue properly lies before this Court pursuant to 28 U.S.C. § 1409 and other applicable law.

## BACKGROUND ALLEGATIONS

### Schedules

8.       The Debtors filed their Schedules [Doc. No. 8], including the Statement of Financial Affairs (the "SOFA") shortly after the Petition Date.

9.       Both Debtors listed personal property on Schedule B of the Schedules in the aggregate amount of $43,588.65, comprised of household goods and furnishings, two large tapestries, machinery and equipment, two Waverunners and trailers, a vehicle, causes of action, and a pre-paid college plan.

10.      The Debtor Husband listed clothing, jewelry, a weapon, an E*TRADE account, his interest in Apex Radiology, Inc., and a cause of action against Radiosphere, all having an aggregate value of $977.

11.      The Debtor Wife listed clothing, jewelry, fur coats, and a camera as her personal property, having an aggregate value of $2,115.

12.       As of the Petition Date, the Debtors claimed that they had no cash in their custody or control and only $148 in their bank account at Florida Commerce Bank (the "FCB Account") as of the Petition Date.

13.     The Debtors listed as the only vehicle owned by them a 1998 Dodge Ram truck with a value at or below the statutory exemption allowed for automobiles pursuant to <u>Florida</u> <u>Statutes</u> (the "Debtor Truck").

14.     The Debtors sought to discharge a total of $4,798,163.53 of unsecured debt by the filing of the Bankruptcy Case.

15.     The Schedules do not list any secured debt, and only $1,609.95 in priority debt of the Debtor Husband, dating from a 2007 Missouri Department of Revenue claim.

16.     Schedule I states that both Debtors are unemployed and generate no income. In response to Question No. 13 of Schedule I, the Debtors indicated that there is not likely to be an increase or decrease in their income in the year following the Petition Date.

17.     Schedule J shows monthly expenses in the aggregate amount of $12,313.10, including premiums for life insurance of $1,512.78 and alimony, maintenance, and support in the amount of $503.25.   In response to Question No. 24 of Schedule J, the Debtors indicated that they do not expect an increase or decrease in their expenses within the year following the Petition Date. However, the Debtor Husband testified at the 341 Meeting that the child support payments for his natural son would terminate at the time he turned 18 years old, to occur on or about June 2015, clearly within the year following the Petition Date.

18.     The SOFA shows no income for the Debtors in the years 2013 and 2014 and 2015 pre-petition, other than consulting income in the amount of $10,800 earned by the Debtor Husband in 2014.

19.     Notably, on the eve of filing the Bankruptcy Case with $12,000 in alleged expenses to be paid, assets that are disproportionate to the debt sought to be discharged and with less than $200.00, the Debtors made a loan repayment to Vernon Rome, the Debtor Husband's father.

20.     The Debtors failed to disclose the insurance loss from the Debtors' Missouri property in SOFA 8 or the losses attributed to the Lead Shot and failure to return the Debtors' coins described below with respect to Tulving.

21.     The Debtors listed in the Schedules claims against Tulving and F&S, both defined below.

Entrepreneurial or Alter Ego Business Ventures

22.     The Debtor Husband was at one time a championship collegiate wrestler and a mixed martial arts competitor.  However, in the mid to late 90's he became active in the radiology business and also became active in  various business ventures, some  of which resulted in the formation of corporate entities in Florida and Missouri through the mid-2000's, the most successful of which was Apex Radiology, Inc.  ("Apex").

23.     Apex delivered teleradiology services with some unique platforms that facilitated the prompt delivery of radiology services from remote locations.  The Debtor Husband provided management and leadership services to Apex over a period of years, including but not limited to overseeing the complex computer systems needed to provide Apex services and the transition of those computer systems from Florida to Missouri.  The Debtor Husband was featured in an Apple publication for the sophistication of the computer systems being used by Apex in the course of its business.

24.     Some of the Debtor Husband's other business ventures included but are not limited to a limousine service, restaurants, management of UFC fighters, an American Top Team gym and other activities associated with American Top Team, speculation in real estate, and operation of a payday loan company, Macon Payday Loan, Inc. ("MFC").    In addition to the formal business ventures, the Debtor Husband has testified that he regularly engages in informal

deals whereby he buys and sells different products including but not limited to architectural salvage, and gold and silver coins and bullion, vehicles, and other items of personal property.

25.     Although the Debtor Wife's education beyond high school was in the medical field, the Debtor Wife ceased working in that field many years ago and devoted herself to the Debtor Husband and their family, working in tandem with the Debtor Husband in support of his business enterprises as needed.  The Debtor Wife never took an official role in the many business enterprises that the Debtor Husband engaged in and has alleged that she held no ownership interest, was not an officer, director, manager, or formal employee of any business owned in whole or party by the Debtor Husband.  Nevertheless, it is apparent that the Debtor Wife regularly acted as the Debtor Husband's agent in financial transactions related to the entities.  The Debtor Husband gave the Debtor Wife signing authority on bank accounts of many of his businesses and the Debtor Wife consistently and in the ordinary course would make cash deposits and withdrawals from the various business bank accounts and/or authorize transfers to or from the business accounts or to or from the business accounts and the Debtors' personal accounts, dating from 2008, if not earlier.

26.     In 2007, Apex sold substantially all of its assets (the "Asset Sale") to Franklin & Sidelman, LLC n/k/a Radisphere National Radiology ("F&S") for an upfront cash payment of $4,100,000.00 (the "Initial Payment") and a promissory note in the amount of $3,500,000.00 to be paid by periodic payments over a period of three years with credits for events that were negotiated in the sales agreement between Apex and F&S (the "F&S Note").  The Debtor Husband received almost $1,500,000 of the Initial Payment.

27.     As part of the Asset Sale, the Debtor Husband was given an employment and consulting contract with F&S.

28.     Following the Asset Sale, the Debtor Husband terminated his employment with Apex and became an F&S employee pursuant to that contract.

29.     F&S breached the F&S Note and soon thereafter terminated the Debtor Husband's employment with F&S, both events resulting in litigation against F&S and creating financial distress for the Debtors.  Following his termination by F&S, the Debtor Husband became a "professional litigator" in his own words, having been authorized by the shareholders of Apex to supervise F&S Note litigation and represent Apex' and their interests as well as managing his own litigation and the many claims that began to be made against him, his companies, or against he and the Debtor Wife.

30.     The Debtors' financial records suggest that from 2009 and subsequent the Debtors treated many of the Debtor Husband's businesses as alter egos of the Debtors or Debtor Husband by paying personal bills or making personal purchases from various business bank accounts, transferring sums to and from the businesses and to and from the businesses and personal accounts without any business basis or legal or corporate formalities, comingling of income derived from one or more companies, and similar actions.

31.     The Debtors indicated in the Schedules that neither of them were employed in 2013, 2014, and for the months in 2015 prior to the Petition Date.  The only pre-petition income stated in the Schedules was $10,800 was earned by the Debtor Husband in 2014 for consulting.

32.     Upon information and belief the Debtor Husband provided services as a head coach at ATT Rockledge, located in Rockledge Florida and also provided services at ATT Space Coast located in Cocoa Beach, Florida pre-petition.  The Debtor Husband testified that he earned no income from his services pre-petition but had started to earn money for his services paid post-petition [9/3 Exam].

33.     In addition, upon information and belief the Debtor Husband is affiliated with ATT AMPD, a gym located in Macon Missouri in which Hannah and Brandon Zeciri appear to have an ownership interest.  Advertisements for the gym suggested that the Debtor Husband travels to the gym several times a year for the purpose of assisting Brandon Zeciri with classes and training.

34.     The Schedules reflect that each of the Debtors seeks to discharge almost $1,000,000 in individual debt and more than $2,000,000 in joint debt through the Petition Date.

<u>Litigation</u>

35.     In or around 2009, various lawsuits were filed against each or both of the Debtors and/or against the Debtor Husband's companies and continued to be filed over the next several years, many of which resulted in judgments against the Debtors individually or jointly.  In addition to the lawsuits listed by the Debtors in response to Question No. 4 of the SOFA, there were additional lawsuits filed including but not limited to: a)  an eviction lawsuit against Wade Rome in Missouri Case No. 09-BA-CV05246; b) a mechanic's lien filed by Con-AGG of Mo, LLC against Delmart Development, LLC Case No. 09-BA-MC-00273; c) a claim by Con-AGG of Mo, LLC against the Debtor Husband Case No. 09-BA-CV-03186; d)  a claim by Mid-City Lumber Co, Ltd. against the Debtor Husband Case No. 09-bA-MC-0223;   and e) a case by Brownfield Oil Co., Inc. against the Debtor Husband Case No. 09-RA-CV-01352.

36.     Included in the Schedules are several substantial judgments obtained against one or both of the Debtors as well as claims for counsel that represented the Debtors and did not get paid for their services.  Also included are medical debts, consumer credit debts, and utility bills incurred from 2009 through the Petition Date.

B&H Auto Sales, LLC

37.     The Debtor Husband, together with Brandon Zeciri, incorporated B&H in Missouri on or about August 8, 2011.

38.     Upon information and belief, the Debtor Husband, Brandon Zeciri, and Hannah Zeciri executed and filed with the Missouri Department of Revenue an application for a dealer license on behalf of B&H (the "B&H Application"). The B&H Application represented that the Debtor Husband, Brandon Zeciri, and Hannah Zeciri each held an ownership interest in B&H.

39.     Upon information and belief, the Missouri Department of Revenue approved the B&H Application and issued a dealer license to B&H (the "B&H License") that was effective through the remainder of 2011. In connection with the B&H License, the Missouri Department of Revenue assigned D9213 as B&H's dealer number and issued master dealer plates with that number (the "Master Plate"). The Master Plate comprised a front and back plate to be used on one vehicle.

40.     Upon information and belief at some point the Missouri Department of Revenue issued additional dealer plates, each of which had a unique identifier in addition to the dealer number and each of which included a front and back plate.

41.     Upon information and belief, in the fall of 2011 and 2012, Brandon Zeciri made application on behalf of the owners of B&H to the Missouri Department of Revenue to renew the B&H License for the years of 2012 and 2013, both renewal applications being approved. In each of the renewal applications the Debtor Husband continued to be listed as an owner of B&H.

42.     Pursuant to the rules governing dealers in Missouri, B&H was required to notify the Missouri Department of Revenue of its "storage" of any vehicles that it held for purposes of resale pursuant to the B&H License that were not otherwise located at the address of record with

the Missouri Department of Revenue.  Upon information and belief, at no time during the period that B&H held a B&H License did B&H advise the Missouri Department of Revenue that the Odyssey or the Titan were being "stored" at a location other than B&H's address of record with the Missouri Department of Revenue.

43.     Upon information and belief, B&H made no application for renewal of the B&H License in 2013 for the year of 2014, or any subsequent year such that B&H was not a licensed dealership from January 1, 2014, and at all times thereafter.

44.     Upon the termination of the B&H License, B&H was required by law to title and register its vehicles with the State of Missouri and pay applicable sales tax for any cars that it had ownership of as a dealer that were not reflected as having been sold pursuant to its dealer license in the periodic sales reports filed with the Missouri Department of Revenue.

45.     Upon information and belief, as of the date of this Complaint B&H has failed to pay sales tax for the Odyssey or Titan and has taken no action to transfer title to the vehicles to itself or any other party nor to obtain a valid registration for those vehicles.

46.     Upon information and belief, in each of the renewal applications the Debtor Husband was represented to the Missouri Department of Revenue as an owner of B&H.

47.     Upon information and belief, following the approval of each of the renewal applications, the Missouri Department of Revenue issued a new Master Plate that was good for one year.

48.     Upon information and belief, the State of Missouri does not use stickers as a means of updating its dealer plates but rather issues new plates each year in the number appropriate for the applicable dealer license, such plates being good for the term of the current dealer license.

49.     On or about August 26, 2010, the Debtor Husband purchased the Odyssey.  The title for the Odyssey shows the purchaser as Wade Rome, B&H Auto.  The title appears to have been altered after the fact both because B&H was not in existence at the time of the sale and because the address provided for B&H in the title was not the original address from which it operated.

50.      Because the purchase of the Odyssey precedes the incorporation of B&H, as a matter of law and fact B&H could not hold any legal interest in the Odyssey.

51.     The Debtor Husband holds a legal and equitable interest in the Odyssey by virtue of its acquisition prior to the incorporation of B&H.  The Debtor Wife holds an equitable interest in the Odyssey by virtue of her payment of substantial repairs to the vehicle in June 2013.

52.     Neither Debtor disclosed their legal and/or equitable interest in the Odyssey in the Schedules.  The Debtors have not paid sales tax on the Odyssey to the State of Missouri or the State of Florida nor have they ever registered the Odyssey in any state.  As of the filing of this Complaint, the Debtors are holding an open title to the Odyssey thereby exposing the prior owner to potential liability in the event of an accident.

53.     On or around March 23, 2012, the Debtor Husband and/or the Debtors acquired the Titan from Boomer Trucks, upon information and belief located in Longwood, Florida.  The Debtors did not produce the title to the Titan to the Trustee, alleging that it was in the custody and control of B&H.   As of the filing of this Complaint, the Debtors or B&H are holding an open title to the Titan thereby exposing the prior owner to potential liability in the event of an accident.

54.     The Debtor Husband caused the payment to be made for the Titan from MFC in the amount of $9,300.00.  There is no notation in the memo line of the check to Boomer Trucks

signed by the Debtor Husband that indicates the payment was being made for the benefit of B&H.  There is no indication clearly ascertainable from the records produced by the Debtors that suggests that B&H reimbursed or repaid MFC or the Debtors for the purchase of the Titan.

55.     Upon information and belief, the Debtor Husband and/or the Debtors have a legal and/or equitable interest in the Titan that was not disclosed in the Schedules.

56.     From January 1, 2014, and at all times subsequent both Debtors have operated the Odyssey and/or the Titan in Florida with a fraudulent B&H License, without a valid registration, and using false tags with the intent to  hinder, delay, or defraud the State of Florida and their various creditors.

57.     Prior to January 1, 2014, and from the date of acquisition of the Odyssey and/or the Titan, the Debtor Husband used B&H as a means by which he could acquire and hold vehicles for his and the Debtor Wife's use without the Debtors having to perform their statutory obligations related to ownership and as a means to hinder, delay, and defraud their creditors and the State of Missouri and Florida.

58.     In the 341 Meeting and the 2004 Exam, the Debtor Husband has conditionally or unequivocally denied having any ownership interest in B&H or at any time being employed by B&H, asserting only an informal relationship without any contractual obligations or benefits.  If the Debtor Husband's testimony is truthful and accurate both as to his ownership interest in and/or employment by B&H and B&H's ownership of the vehicles, the Debtor Husband would have no legal or statutory right to retain possession of the Odyssey or Titan and to drive those vehicles over a period of years with dealer plates and pursuant to the B&H License or to obtain insurance without naming B&H as a beneficiary of the insurance policy.

59.     Similarly, the Debtor Wife would have never had the right or entitlement to drive the Odyssey or the Titan with dealer plates and pursuant to the B&H License or to obtain insurance without naming B&H as a beneficiary of the insurance policy.

60.     For the reasons described herein all of the actions by the Debtors subsequent to the acquisition of the Odyssey and Titan are consistent with ownership of the vehicles.

Residence/Domicile

61.     The Debtor Husband leased the Nebraska Residence (432 S. 11th Street, Apt. 2, Lincoln, Nebraska) for a two year term beginning in May 2012.

62.     Neither of the Debtors resided at the Vernon Rome Residence located in Titusville, Florida at any time relevant.

63.     Despite alleging that the Nebraska Address was intended to be her domicile, the Debtor Wife failed to obtain a Nevada driver's license within thirty (30) days of establishing a residence in that state and did not register her car as required by Nebraska law for its residents.

64.     The Debtor Wife also did not register to vote in Nebraska, open a bank account, or take any other action consistent with an intention to establish a domicile in Nebraska.  The Debtor Wife did not file a Nebraska income tax return despite jointly and severally receiving over $1,000,000 during the period she allegedly lived in Nebraska.

65.     Although the Debtor Husband indicated in the SOFA and in testimony at the 341 Meeting and 2004 Exam that he never resided at the Nebraska Address, the documents produced by the Debtors and testimony adduced at the 2004 Exam show that the Debtor Husband spent periods of time at the Nebraska Address with the Debtor Wife on a regular basis, even keeping the Odyssey in Nebraska so that he had access to transportation during his visits.

66.     Moreover, the Debtor Husband submitted responses to interrogatories under oath in pending litigation, stating under oath that he resided at the Nebraska Address.

67.     Despite testifying in the 2004 Exam that the Debtor Husband intended to establish the Florida Address as his domicile, the Debtor Husband failed to obtain a Florida driver's license within thirty (30) days of establishing a residence in Florida and did not title or register the Debtor Car as required by Florida law for its residents.

68.     Both Debtors maintained a post office box in Macon, Missouri (the "Missouri Address") after vacating their Missouri properties and ostensibly relocating to either Florida or Nebraska or both.   The Debtors continued to utilize the Missouri Address for purposes of acquiring or renewing insurance policies for years after they had no residence in the state, and for other matters by which they were benefitted by retaining a Missouri address.

69.     The Debtor Wife established the FCB Bank Account with the Debtor Husband in October 2012, and thereafter relied principally on that account for the purposes of making cash withdrawals and deposits on a regular basis. The FCB Statements were delivered to the Debtors at the Florida Residence.   The Debtor Wife also established a customer relationship with a beauty salon and a nail salon in Florida and made regular visits to those establishments.

70.      The establishment of the Missouri Address, the Nebraska Address, the Florida Address, and the Vernon Rome Address as addresses or locations of the Debtors furthered the strategic objectives of the Debtors, including but not limited to:  (a) creating obstacles to the service and prosecution of legal claims and/or discovery in aid of execution by their individual or joint creditors; (b) creating a putative basis to resist jurisdiction of impending or pending litigation in a particular state; (c) isolating specific transactions or business activities; d) facilitating the legal fiction that the Odyssey and Titan were property of B&H and the use of the

B&H License and Master Plate; e) facilitating the acquisition or renewal of insurance policies on the Odyssey and the Titan as well as other vehicles being driven by the Debtors; or members of their family; f) avoiding the statutory obligations attendant to residence or domicile in a particular state, including but not limited to obtaining a driver's license, registering vehicles, paying personal property tax, and filing state income tax returns; g) establishing residency for purposes of enrolling Gage Rome in a Florida high school that afforded an opportunity to play sports and potentially seek a scholarship for college; and h) facilitating the ability to attend football games and spend time with their children located in two different states.

<u>Insurance</u>

71.     For the period of June 2012 through August 11, 2014, the Debtors carried Missouri insurance on their vehicles, even though the vehicles were allegedly being operated predominantly in Florida and Nebraska.  The Missouri insurance policy showed the Debtors' address as the Missouri Address and indicated the vehicles were garaged at 1813 Oakhill Drive, Macon, Missouri even though that property had been foreclosed several years prior.  The Missouri insurance policy in 2014 included insurance for a Honda Element even though one or both of the Debtors had transferred ownership of that vehicle to Chase Rome.

72.     In August 2014, the Debtors procured Florida insurance from Geico on the Odyssey and Titan now using the Florida Address (2085 Eastwood Drive, Merritt Island, Florida) as the insureds' address.  The Debtor Truck is not insured by the Florida insurance.

73.     Upon information and belief one or both of the Debtors misrepresented or omitted material facts regarding their residence and the ownership of the vehicles that are the subject of the Missouri insurance.  Similarly, one or both of the Debtors misrepresented or omitted material facts regarding the ownership of the vehicles that are the subject of the Florida insurance.

14

74.     The lease for the Nebraska Address did not require renter's insurance to be procured.  Nevertheless, the Debtors applied for and obtained personal property and liability insurance for the Nebraska Address for the duration of the lease, even though they testified that they vacated the property with almost a year of the lease remaining.

75.     On the other hand, the Florida Address lease with Sandra Trudeau and the Debtor Husband's lease of commercial property from Noro & Co., Inc. required insurance that was never purchased or obtained.

### F&S Settlement

76.     On or about October 15, 2012, the Debtors received a joint and several payment from F&S pursuant to a settlement reached in the Employment Litigation (the "F&S Settlement Proceeds").  The F&S Settlement Proceeds, in the amount of $1,137,197.59 were deposited into the FCB Account.

### Cash Transactions

77.     Following receipt of the F&S Settlement Proceeds both Debtors regularly engaged in numerous cash transactions, often in substantial amounts.

78.     The FCB Account shows a pattern of the Debtors both making large withdrawals and then at a later date making smaller cash deposits sometimes many times within the same week.

79.     The Debtor Husband has previously testified in other litigation that he kept large amounts of cash in his residence, some of which resulted from buying and re-selling undisclosed items.

80.     When examined on the purpose of the withdrawals, the most common response was that the Debtors did not know or could not remember with just wanting money to hold and carry around being a close second.

81.     Similarly, when examined on the source of the cash deposits, for all but a small number of transactions, the Debtors were unable to provide any explanation of the source of the cash being deposited.

82.     Both Debtors were examined on the expenses that are reflected in the Schedules, which did not appear to be supported by the FCB Account transactions and for which there were few or no receipts or invoices that were even close to the amount claimed but could not explain the discrepancy.

83.     Although not cash transactions, the FCB Accounts reflects payments in the aggregate amount of $69,250.00, made to Vernon Rome with an interlineation on the memo line of the check stating "loan repayment" for the majority of the checks.  Nevertheless, the Debtor Husband testified at the 2004 Exam that, other than the loan repayment made on the eve of the Petition Date, all of those transactions were the return of monies held "in trust" by the Debtor Husband in connection with deals (that did not result in a cash recovery) from funds provided by Vernon Rome to the Debtor Husband in connection with such opportunities.

<u>Tulving and Gold and Silver Purchases</u>

84.     In addition to large cash withdrawals made by the Debtors, the Debtors used a portion of the F&S Settlement Proceeds to acquire gold and silver coins and bullion, predominantly from The Tulving Company, Inc. ("Tulving").

85.     Between the dates of November 12, 2012, and December 5, 2013, the Debtors made payments to Tulving in the aggregate amount of $577,127.41 for purchases of gold and silver coins, as well as substituting coins purchased from Tulving for different coins.

86.      In addition, one or both of the Debtors made purchases of silver or gold coins or bullions from local dealers or at coin shows in the aggregate amount of $75,954.38.

87.     The Debtor Husband testified that the Debtors did not receive all or a portion of coins, the Debtors did not receive any of the coins purchased in December 2013, the coins that were sent for substitution were not returned, and 7 sealed "monster" boxes containing 3,500 coins were ultimately found to contain lead shot (the "Lead Shot").

88.     In or around January 2013, the Debtor Husband initiated a complaint with the Orange County District Attorney's Office (the "Tulving Complaint") that was forwarded to the California Office of Business Oversight.  The documents produced by the Debtors relating to the Tulving Complaint addressed only the alleged failure of delivery of the December 2013 product and the return of the coins being traded.   The Tulving Complaint contained attachments, including e-mail communications between the Debtor Husband and Tulving that were not produced to the Trustee.

89.     At some point an employee of Business Consumer Alliance attempted to liase between the Debtors and Tulving but were not successful.

90.     The Debtor Husband has testified that the Debtors incurred a loss of approximately $300,000 as a result of the actions of Tulving.

91.     On March 10, 2014, Tulving filed a bankruptcy case in the United States Bankruptcy Court, Middle District of California, Case No. 14-11492-ES (the "Tulving Bankruptcy").

92.     Shortly after the filing of the Tulving Bankruptcy, the Court appointed R. Todd Neilsen (the "Tulving Trustee") as trustee and the case converted to a Chapter 7.

93.     The Tulving Trustee made extraordinary efforts to identify all potential claimants from the Tulving Bankruptcy and communicated with them by mail and by e-mail to urge the filing of a claim as well as maintaining a regularly updated website.

94.     The Debtor Husband testified at the 341 and 2004 Exam that he received no communications or correspondence from the Trustee and did not file a claim in the Tulving Bankruptcy for any amount.

95.     Upon information and belief the Debtors do not have a meritorious claim against Tulving or in the Tulving Bankruptcy.

96.     The fact that the Tulving Trustee has not identified the Debtors as creditors of Tulving suggests that the Tulving books and records in the custody and control of the Tulving Trustee indicate that all product paid for by the Debtors was received by the Debtors.

97.     Although the Debtor Husband testified at the 341 and the 2004 Exam that the Debtors made multiple sales of the Tulving coins in late 2012 and early 2013, in a period of more than four (4) months the Debtors have been unable to produce any documents evidencing such sales.

98.     Upon information and belief the Tulving Trustee has not received any claims from creditors suggesting that they received Lead Shot or any other foreign substance other than what was purported to be sold by Tulving.  The Debtors' failure to produce the Lead Shot or any correspondence or communications relating to the same supports a conclusion that this simply did not occur.

99.     Based upon the lack of objective support for the Debtors' alleged losses, the absence of any communication by the Tulving Trustee, the apparent disinterest in making a claim in the Tulving Bankruptcy by a person who styles himself as a professional litigator at a time when the Debtors have testified that there were having financial distress, it appears that the Tulving losses are alleged as a means to explain otherwise unexplainable loss of assets.

100.    The Tulving explanation for loss of assets appears to be consistent with the Debtors' omissions, misrepresentations, and outright lies that are otherwise alleged in this Complaint.

<u>Taxes</u>

101.    The Debtor Wife prepared the federal tax returns for the 2012 and 2013 tax years using a Turbo Tax program with the assistance and participation of the Debtor Husband.

102.    The 2012 federal tax return was filed only after one or both of the Debtors procured transcripts of the documents that the Internal Revenue Service ("IRS") had received showing income for the Debtors and presumably confirming that the IRS was unaware of their receipt of the F&S Settlement Proceeds.

103.    Neither of the Debtors consulted a tax professional for purposes of determining the appropriate tax treatment for the F&S Settlement Proceeds.  The Debtor Wife testified that she did not research the appropriate treatment of the F&S Settlement Proceeds.

104.    The Debtor Wife testified that she did not review or retain any documentation regarding the Debtors disposition of gold and silver coins and bullion and neither requested nor obtained any specifics of the alleged Tulving losses from the Debtor Husband.  The Debtor Husband testified that he would "true up" the basis and sale price of any gold and silver coins or bullions transactions in connection with the end of the tax year but admitted that at best he would use a yellow legal pad that indicated by plus or minus whether a transaction had made or lost money but did not

explain how such records would accurately account for the gain or loss realized on the sale of gold or silver coins or bullion..  No documents were produced by the Debtors over the course of almost five (5) months that would provide any clarity as to the sale of gold and silver coins and bullion, to the extent that such sales occurred.

105.    For both years, the returns indicate the home address of the Debtors is the Vernon Rome Address (2085 Nottingham Court, Titusville, Florida).

106.    The 2012 return includes a long-term loss associated with the March 2012 of property that was not reported on a Form 1099-B, income related to a distribution under a qualified plan, a deduction for payment of $11,193 in taxes, and payment of $440 in real estate taxes.  The 2012 return does not reflect the F&S Settlement Proceeds as gross income or having been received by the Debtors.

107.    Neither of the Debtors prepared or filed a state income tax return for Nebraska for the tax years of 2012 and 2013 or Missouri for the tax year of 2012.

<u>Trustee Inspection</u>

108.    On August 12, 2015, the Trustee conducted an inspection of the Florida Residence for the purpose of identifying and recording information regarding the personal property shown in the Schedules.

109.    Upon arrival at the Florida Residence, the Trustee viewed two Liberty Lincoln safes (collectively, the "Liberty Safes") that were at least five (5) feet in height and two (2) feet in width.  The Debtors indicated that they owned one of the Liberty Safes and Chase Rome owned the other one.  The Liberty Safes had not been included in the Debtor Documents produced to the Trustee over the span of the dates on which the 341 Meeting was conducted nor reflected in photographs of the Florida Residence produced by the Debtors to the Trustee

(collectively, the "Debtor Photos").  The Debtors refused to permit the Trustee to view the contents of the Liberty Safe alleged to belong to Chase Rome.

110.    During the August Inspection, the Trustee also observed 45 or more cases of Mountain House freeze-dried food, having an approximate aggregate value in excess of $5,000.00, that were not reflected on the Schedules (the "Camping Supplies").

111.    The Trustee also observed a large quantity of ammunition of various types that had not been disclosed on the Schedules (the "Ammunition").  The Debtor Husband testified at the 9/3 Exam that he had obtained the Ammunition as a gift from Vernon Rome post-petition following the pre-petition death of his uncle.

112.    Although the Trustee asked to see the Lead Shot allegedly substituted for 3,500 sealed silver coins or the boxes and seals that had contained the "silver" during the Inspection, the Debtors did not produce anything other than a few boxes, indicating that the Debtor Husband had mailed some or all of the Lead Shot and possibly other items to someone in California who had a connection with the Tulving Complaint.

113.    When the Trustee asked to see the Debtor Truck during the Inspection she was told that the vehicle was in Nebraska.

114.    The Debtors permitted the Trustee to view the interior and trunk of the Odyssey and to review the documents in the glove compartment.

115.    The Debtors refused to permit the Trustee to view the interior and trunk of the Titan or to review the documents in the glove compartment.

Omitted Assets

116.    On July 24, 2015, the Debtor Husband testified that he did not keep gold and silver purchased from Tulving in a safe but rather kept it under the mattress of his bed.  [7/24 341]  In an apparent effort to deflect questioning from the safe the Debtor Husband then

voluntarily offered that he did not have a safety deposit box, even though there was no pending question relating to safety deposit boxes that had been asked [7/24 341].

117. On August 12, 2015, when the Trustee's counsel enquired of the Debtor Wife if she kept her gun in a safe, the Debtor Husband interjected "that's privileged" and the Debtor Wife simply said "No."  [8/12 341].  Although this line of question raised the issue of a safe, neither Debtor took the opportunity to apprise the Trustee that one or more safes at the Florida Residence had been omitted from their Schedules.

118. During the 8/12 341, both Debtors were asked directly whether there were any additional amendments or corrections that needed to be made to their Schedules and both Debtors testified that other than amendments/corrections that had been the subject of prior 341's there were not.

119. The Debtors indicated that there were omissions and errors in their schedules during the 341 conducted on 4/25/15. As of the filing of this Complaint, no amendment to the Schedules has been filed to make the amendments and corrections that were the subject of this testimony.

120. The Debtors, on the other hand, did not identify one or more omissions or errors, including but not limited to: a) the failure to include in Schedule B one or more safes, cases of freeze-dried food, the Ammunition; b) the Debtor Husband's failure to include in Schedule B his interest in corporate entities other than Apex, including B&H; the failure to schedule the Odyssey and Titan as property legally or equitably owned by the one or both of the Debtors; and c) the Debtors' failure to include property belonging to Chase Rome or Taquan Kelly located in the Florida Residence that was alleged to not be property of their bankruptcy estates.

121.    None of the pictures of personal property submitted to the Trustee in response to her request for the same included pictures of the Liberty Safes.

122.    Other than the self-serving testimony of the Debtors no documentation or evidence was produced by the Debtors in support of the Liberty Safe being owned by Chase Rome rather than by one or both of them.  One or both of the Debtors at some point testified that their response to Question No. 14 of the SOFA was meant to identify the "safe" listed there as a safe held by or for the benefit of Chase Rome, in addition to other inconsistent testimony on the subject.

123.    On September 2, 3, and 15, 2015, in connection with the 2004 Exams of the Debtors, the Debtor Husband insisted that the Debtors had produced pictures of the Liberty Safe to the Trustee.

124.    At the 9/15 Exam, the Debtor Husband produced ten (10) pictures of the Liberty Safes and initially insisted that the Debtors produced at least three (3) of those pictures to the Trustee but then later acknowledged that it was possible that the Debtors had intended to produce the pictures but had not done so by inadvertence or mistake [9/15/15 Exam and Exhibit Nos. 18 and 19].

125.    The next day, the Debtor Husband filed an amendment to Schedule B under penalty of perjury to add "Husbands Safe" to the personal property listed for Question 4 of that schedule, but indicating that no additional value was added to the assets as the value of the safe was already included therein.  No explanation was offered as to how that could be given that all of the other property listed in response to that question was listed as joint property.  Upon information and belief a Liberty Safe of the type owned by the Debtors has a value of between $900 and $3,000.

<u>Financial Records and Property of the Estate</u>

126.    The Debtors produced more than 4,000 pages in response to Trustee document requests made of record in the 341 Meetings.

127.    That being said, there were substantial records that were not complete or that were not produced that had been requested by the Trustee for purposes of administering the estate for the benefit of creditors, including but not limited to: a) complete bank statements for the Debtor Husband's entities (due to incompleteness of returns it is impossible to trace the flow of monies between the entities and the entities and the Debtors; b) financial statements, profit and loss statements and corporate tax returns for the Debtor Husband's entities; c) legal invoices supporting the claim that the Debtor Husband funded $400,000 in legal fees; d) receipts or other records reflecting the sale of gold and silver coins and bullion that occurred in 2012 and 2013 or that were not reported on the SOFA; e) attachments to the Tulving Complaint; f) supporting documents for tax returns, including but not limited to proof of payment of personal property tax in 2012; and g) documents, records, or receipts supporting the source of cash deposits or the use of cash withdrawals.

**COUNT 1**
**OBJECTION TO DISCHARGE OF**
**DEBTORS PURSUANT TO SECTION 727(a)(2)(B)**

128.    This is an action to deny the Discharge of the Debtors pursuant to Section 727(a)(2)(B).

129.    The Trustee alleges and incorporates the allegations in paragraphs 1 through 127 as though fully set forth herein.

130.    The Debtors with the intent to defraud the Trustee, an officer of the estate charged with custody of property of this title, transferred, removed, or concealed, or has permitted to be transferred, removed, concealed property of the estate, after the date of the filing of the petition.

WHEREFORE, the Trustee respectfully requests that this Court deny the discharge of the Debtors.

**COUNT II**
**OBJECTION TO DISCHARGE OF**
**DEBTORS PURSUANT TO SECTION 727(a)(3)**

131.    This is an action to deny the Discharge of the Debtors pursuant to Section 727(a)(3).

132.    The Trustee realleges and incorporates the allegations in paragraphs 1 through 127 as though fully set forth herein.

133.    The Debtors have concealed or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the Debtors' financial condition or business transactions might be ascertained.

WHEREFORE, the Trustee respectfully requests that this Court deny the discharge of the Debtors.

**COUNT III**
**OBJECTION TO DISCHARGE OF**
**DEBTORS PURSUANT TO SECTION 727(a)(4)(a)**

134.    This is an action to deny the Discharge of the Debtors pursuant to Section 727(a)(4)(a).

135.    The Trustee realleges and incorporates the allegations in paragraphs 1 through 127 as though fully set forth herein.

136.    The Debtors made several material false oaths in connection with the Bankruptcy Case.

137.    The Debtors false oaths including but not limited to the failure to disclose in the Schedules and/or the Sofa and the 341: a) the Debtors' Liberty Safe; b) Chase Rome's property, including his alleged ownership of the other Liberty Safe; c) the Ammunition; d) the Debtors' equitable and legal interest in the Odyssey and Titan; e) the Camping Supplies; and f) the Debtors' ownership interest in B&H and other entities described herein.

138.    The Debtors made these false oaths knowingly and fraudulently in this case and in connection with this case.

WHEREFORE, the Trustee respectfully requests that this Court deny the discharge of the Debtors.

## COUNT IV
## OBJECTION TO DISCHARGE OF
## DEBTORS PURSUANT TO SECTION 727(a)(4)(D)

139.    This is an action to deny the Discharge of the Debtors pursuant to Section 727(a)(4)(D).

140.    The Trustee realleges and incorporates the allegations in paragraphs 1 through 127 as though fully set forth herein.

141.    The Debtors knowingly and fraudulently withheld from the Trustee recorded information related to their ownership of the vehicles, related to their ownership of the estate and related to their transactions involving purchases of gold and silver.

WHEREFORE, the Trustee respectfully requests that this Court deny the discharge of the Debtors.

## COUNT V
## OBJECTION TO DISCHARGE OF
## DEBTORS PURSUANT TO SECTION 727(a)(5)

142.    This is an action to deny the Discharge of the Debtors pursuant to Section 727(a)(4)(D).

143.    The Trustee realleges and incorporates the allegations in paragraphs 1 through 127 as though fully set forth herein.

144.    The Debtors through their failure to provide sufficient information about their financial transactions including but not limited to their cash transactions and their transactions in gold and silver have failed to explain satisfactorily, any loss of assets or deficiency of assets to meet the Debtors' liabilities.

WHEREFORE, the Trustee respectfully requests that this Court deny the discharge of the Debtors.

Dated September 18, 2015.

/s/ Bradley M. Saxton
Bradley M. Saxton, Esquire
Florida Bar No. 0855995
bsaxton@whww.com
**Winderweedle, Haines, Ward**
  **& Woodman, P.A.**
Post Office Box 1391
Orlando, FL 32802-1391
(407) 423-4246
(407) 423-7014 (facsimile)
Attorneys for Carla P. Musselman, Trustee